Filed 9/21/22  P. v. Reese CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHNNY JAY REESE,<br><br>Defendant and Appellant. | C093095<br><br>(Super. Ct. No. 17FE009151) |

Defendant Johnny Jay Reese molested the daughter of his girlfriend several times between April 21, 2011, and April 20, 2013, and again between October 31, 2016, and April 4, 2017.  He was charged with four counts of committing a lewd and lascivious act against a child under the age of 14 (Pen. Code, § 288, subd. (b)(1)[1] (counts 1, 3, 4, and 5)) and one count of sodomy of a child under the age of 10 (§ 288.7, subd. (a) (count 2)),

---

[1] Undesignated statutory references are to the Penal Code.

1

along with two strike and serious felony allegations (§§ 667, subds. (a), (e)(2) & 1170.12, subd. (c)(2)). Counts one through three were alleged to have occurred between April 21, 2011 and April 20, 2013, while counts four and five were alleged to have occurred between October 31, 2016, and April 4, 2017. A mistrial was declared after the jury could not reach a verdict. Defendant was convicted of all counts on retrial. The trial court sustained the strike and serious felony allegations and sentenced defendant to state prison for 40 years plus 165 years to life.

On appeal, defendant contends: (1) the trial court erred in allowing the prosecution to amend the information to change the date range of counts one through three in a manner which did not conform to the proof at the preliminary hearing; (2) trial counsel was ineffective in failing to object to Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence; (3) it was prejudicial error to instruct the jury with CALCRIM No. 1193 regarding the CSAAS evidence; (4) trial counsel was ineffective in failing to object to the admission of photos of the victim when she was younger; (5) it was prejudicial error for the trial court, at the beginning of the COVID-19 pandemic, to inform the jury during its deliberations that a juror had been excused for not feeling well, and ineffective assistance for trial counsel not to object; (6) cumulative error warrants reversal; and (7) the imposition of certain mandatory fines and fees without determining his ability to pay was a deprivation of various constitutional rights. He further contends in two supplemental briefs that the case must be remanded for resentencing due to changes to section 654 in Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) (Assembly Bill 518) and changes to section 1170 in Senate Bill No. 567 (Stats. 2021, ch. 731, § 1) (Senate Bill 567).

Except to remand for resentencing, we affirm. Defendant, whose defense was he did not commit the alleged crimes, was not prejudiced by the amendment of the information, particularly since he was tried twice on the same charges. The CSAAS evidence was properly admitted, and counsel was not ineffective for failing to raise what

2

would be a meritless objection. CALCRIM No. 1193 is proper and does not bolster the complaining witness's credibility. The pictures of the victim at the time the crimes were alleged were not prejudicial, so counsel was not ineffective for failing to object to them. The claim that the trial court committed misconduct by truthfully telling the jury a juror had been excused for not feeling well is both forfeited and without merit. So, too, is the claim regarding fines and fees.

While remand under Assembly Bill 518 is unnecessary, remand under Senate Bill 567 is required, as there is a reasonable probability of a more lenient sentence had the trial court complied with the new statute. Otherwise, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

*1. Background*

When Doe was six or seven years old, she lived with her mother, April J., and her mother's boyfriend, defendant, in a house in Oak Park off of 8th Avenue in Sacramento. April began dating defendant when Doe was three years old. Doe never knew her biological father and thought of defendant as a father figure. April was pregnant with defendant's son when they moved there. She gave birth to a boy, J., in November 2011. Defendant's daughter M. would sometimes stay with Doe and her family. When she stayed over, the two girls shared a room and slept on bunk beds, with M. on top and Doe on the bottom.

April worked two jobs, from 3:00 p.m. to 11:00 p.m. or 4:00 p.m. to midnight. Defendant watched the children and put them to bed when April was at work.

Defendant and April split up about a year after living in Oak Park. April moved to her mother's house in Vacaville with Doe and J. April and defendant had an up and down relationship, but Doe's relationship with defendant was good. Defendant would visit the children in Vacaville and April would bring them to Sacramento to visit

3

defendant from time to time. On the Sacramento visits, defendant would have to stay with them in a motel, as this was the only way to ensure the children would be in a clean, drug-free environment. This arrangement lasted for about a year, with defendant's visits interrupted by his periodic bouts of incarceration.

The jury was informed that defendant was in custody at Sacramento County jail from September 29, 2011 to October 8, 2011; December 29, 2011 to January 27, 2012; and May 11, 2013 to November 4, 2013. Defendant was also in state prison from November 4, 2013 to October 31, 2016. The jury was informed that none of the incarcerations were for sexual offenses.

April next moved to her mother's house in North Highlands, where she and the children lived for about two years. Defendant was incarcerated then, but he and April maintained an on-and-off relationship. April occasionally took Doe to visit defendant in prison. Doe at times wanted to visit defendant, but at other times she did not.

During defendant's imprisonment, April married Neil G. April, J. and Doe lived with Neil G. and his daughter A. in West Sacramento. Doe was in sixth grade when her mother was married to Neil G.

The marriage was short lived. After Neil G. and April separated, April and her children moved in with April's mother, Debra, who had moved to South Sacramento. April resumed her relationship with defendant when he was released from prison. Upon his release, defendant lived with his sister Christina R. in Elk Grove, while staying at Debra's house a few days a week. Also living with Christina R. were her husband Jeff R., Christina R.'s daughter A., and Jeff R.'s mother, Angelena T.

Defendant would stay with April at Debra's house a few times a week. Defendant and April shared a room at Debra's house, with Doe having her own room, and J. sharing defendant's and April's room or sleeping in the living room. April worked long hours in the Bay Area, from as early as 4:00 a.m. and not arriving home until 9:00 p.m. Defendant helped with the children, taking them to and from school and putting them to

4

bed.  On weekends, the children would spend the night with defendant at Christina R.'s house in Elk Grove.  Christina R.'s home was a gathering place for family events and where children would come to stay and hang out.  These included defendant's daughters C. and M., M.'s sister, Doe, and J.  When children spent the night, they primarily slept and congregated in the living room, which had a couch and a recliner.

Angelena T. was in Virginia visiting a sick relative from March 22, 2017, to April 12, 2017.

### 2. *Disclosure and Aftermath*

In the summer of 2016, 11-year-old Doe told seven-year-old A. that she had been raped by defendant.  Doe did not tell A. what "raped" meant when she asked, saying only that it was "in the bathing suit parts."

On March 31, 2017, Elizabeth Irwin, a counselor at Doe's school, was notified by A.'s teacher that she was concerned about A.'s use of the word "rape."  Irwin spoke to A. on April 4, 2017.  A. told Irwin that she had heard the word "rape" from Doe.

Irwin called Doe into her office.  Doe told her she had nothing to say; nothing had happened and she wanted to go back to class.  About 30 minutes later, an upset, nervous, scared, and crying Doe returned to Irwin's office and told Irwin that everything she had asked Doe about was true.  Asked by Irwin who did this and did she still see the person, Doe said defendant had assaulted her and she had seen him two weeks ago.  She told Irwin the abuse started when she was seven years old, and the most recent incident happened two weeks ago, in Elk Grove.  The abuse had stopped when Doe did not see defendant for a few years, but it recently resumed.  Irwin called in the school resource officer, who asked Doe general questions about what happened.  Doe's responses were the same as she gave to Irwin.

Doe was given a Special Assault Forensic Evaluation (SAFE) interview on April 11, 2017.  She said she was seven years old when defendant first molested her.

5

This incident happened at the house where she, her mother, defendant, her brother J., and defendant's daughter M. had lived together.

Doe was sleeping in her room when she was awaked by defendant sitting on her bed, rubbing her thighs and touching her arms. Defendant started to remove her pajama bottoms. When she resisted, he held down her arms and took off her pajama bottoms and underwear. After turning her over so she was lying face down, defendant removed his pants and underwear, got on top of her, and put his "private part" inside her "butt." Doe could not get away because defendant was bigger and stronger than her. He moved "back and forth" and then stopped. Defendant put his pants on, told her not to tell anyone, and left. Doe's butt hurt afterwards. She did not tell anyone because she was scared of defendant and scared no one would believe her.

The last time defendant molested her was at Christina R.'s home, about a month before the interview, when Angelena T. was in Virginia. Doe was falling asleep on the front couch in the living room at around 10:00 p.m. Defendant entered the room, moved Doe over, laid down next to her, removed her sweatpants and underwear, and told her not to move or say anything as he held her arms. Doe tried to push defendant away but he squeezed her. Defendant put his penis in her butt and moved around back and forth. He returned to where he had been sleeping when he finished.

Doe recounted an incident that happened when she was eight or nine years old. Defendant took Doe and J. to stay in a Sacramento motel one night. The room had two beds. Defendant got into Doe's bed with her. She was afraid defendant was going to molest her, but the police knocked on the door and said they were looking for defendant's brother Justin A.

Another molestation happened in the house where she was first molested. She and M. were in their bedroom; M. was asleep on the top bunk while Doe was falling asleep in the bottom bunk. Defendant entered the room and told Doe to come to his room. When Doe went into his room, defendant told her they would be picking up her mother soon.

6

Doe said, "Okay" and returned to her room. Defendant tried to get her to go back to his room, but she refused. After she fell asleep, defendant went into her bedroom and started rubbing her legs and body. Doe repeatedly told defendant to leave her alone, but he did not stop until it was time to pick up her mother from work. Defendant told Doe not to say anything to her mother.

Another incident happened at Christina R. 's house when Doe was 11 years old. Doe and J. were sleeping on the floor, M. was sleeping on the couch, and Christina R. 's daughter A. was sleeping in her parents' room. Defendant came in the room, laid down next to Doe, and started rubbing her like he had before. Defendant took off his undershorts, removed her pajama bottoms, and sodomized Doe. When Doe heard Christina R. coming out of her bedroom, defendant stopped, dressed, and went outside. Doe got up and went to the bathroom. Doe's butt hurt after this.

Defendant sodomized her only at the two houses she described doing it more than once at each location. He once tried to put his penis in her mouth. Doe refused and went out to play. When she came back inside, defendant again asked Doe to let him put his penis in her mouth. When Doe refused, defendant said, "Please, please," but Doe again declined. Defendant told Doe never mind and to forget about it.

Doe's trial testimony was essentially consistent with the SAFE interview. One night, Doe was sleeping in the bottom bunk, with only defendant and possibly J. at home. She was awoken by defendant moving her blankets. Defendant rubbed his hands against her thigh, first over and then under her clothing. He removed her pants and underwear and inserted his penis into her buttocks. Defendant told her not to say anything. He eventually stopped and left. Doe did not tell anyone because she was afraid defendant might do something to her or people would not believe her.

Doe also testified about the event at the Sacramento motel, where defendant was interrupted when the police arrived. Defendant had removed her pants and started touching her by the time the police knocked on the door. Doe testified about the incident

7

at Christina R.'s home, where defendant sodomized her on the living room floor until Doe heard Christina R. coming out of her bedroom. Defendant got up and speed walked to the bathroom after Christina R.'s bedroom door made a noise. She also testified to the abuse resuming after defendant got out of prison. Defendant put his penis in her vagina at her grandmother's house and left a red mark on her neck after sucking on it.

Doe testified that she was molested other times, but "it happened so many times it's hard to remember every detail from every single time."

A sexual assault exam of Doe, administered the day after the SAFE interview, was normal. A majority of children will have a normal exam more than 72 hours after being sexually assaulted.

On May 26, 2017, law enforcement in Reno attempted to arrest defendant on a warrant for his arrest in this case. Officers spotted defendant leaving a residence, and a high-speed chase ensued when they tried to pull him over. Defendant drove through a residential neighborhood at 60 miles per hour while running stop signs, and he drove over 100 miles per hour when the chase continued onto the highway. After defendant crashed his car in a shopping center parking lot, he ran out of the car through a marsh, then jumped a fence and ran into a residential area. Officers set up a perimeter and apprehended him two hours later.

While in jail in Nevada, defendant called his sister-in-law Tawnie using another inmate's personal identification number assigned to each inmate (PIN). During the conversation, he told Tawnie that someone in the jail said the only way to beat the case was to get someone to come forward and say Doe was lying. Defendant thought Christina R. would be "on board," telling Tawnie, "I need someone to say that she's lying - to tell her that she's lying." Defendant pleaded with his sister-in-law to talk to Christina R. about this. He also expressed hope that someone already told Christina R.'s daughter, who was a friend of Doe's, that Doe was lying, "[a]nd if not maybe you guys can put that in her head."

8

A Reno police officer interviewed defendant about some counterfeit money found in his car. Defendant admitted he "went on the run" because of Doe's accusations, which he claimed were false.

### 3. CSAAS Testimony

U.C. Davis psychologist Dr. Anna Washington testified as an expert on child sexual abuse and Child Sexual Abuse Accommodation Syndrome (CSAAS). She had not interviewed anyone involved in the case, had not read any reports from the case, did not know the specifics of the case, and would not offer an opinion on whether Doe was sexually abused.

Dr. Washington stated that most child molesters are male, and most have a prior relationship with the victim. Most abusers know the victim's family, and it is common for the victim's family to pressure the victim or for there to be conflict in the victim's family due to an allegation of abuse against the abuser. A common myth is that abusers use violence to abuse their victims because children fight off the abuser. This is rare, as abusers instead use tactics like grooming, threats, and intimidation to get their victims to submit. Abusers often hold a position of power, such as coach or caregiver, and will select a victim they believe will not disclose the abuse. Children often go along with the abuse because of the prior relationship and the abuser holding a position of power.

CSAAS is a means of dispelling myths about child sexual abuse and helping people understand common reactions to such abuse. It is not used to determine whether a child has been abused or whether someone is guilty of abusing a child. It has five categories describing behaviors common in sexually abused children. Not every category is present in a sexually abused child.

The first category is secrecy. Child sexual abuse often occurs when the perpetrator and victim are alone together, and the perpetrator is likely to take steps to keep the abuse secret. This is achieved through developing a positive relationship with

9

other family members, and using coercion, intimidation, or grooming with the child. Children also keep the abuse a secret as they are vulnerable and fear losing family security or an important relationship. Child victims think no one will believe them.

The second category, helplessness, addresses the myth that a child will fight back against the perpetrator. Victims of child sexual abuse usually do not fight back because the perpetrator is stronger and more sophisticated than the child.

Entrapment and accommodation is the third category. This happens because the abuser has access to the child and the child has a positive relationship with the abuser. The child knows the abuse will continue and feels he or she cannot share the abuse with anyone. This can lead to coping or accommodating strategies such as avoidance, where the child tries not to think or feel about what has happened. It can also manifest through internal mental health symptoms such as depression, anxiety, and self-harm behaviors, or external symptoms such as tantrums, not listening to adults, or not wanting to attend school.

The fourth category, delayed disclosure, addresses the fact that most children do not disclose the abuse for a substantial time. Delayed disclosure is more common when the child has a close relationship with the abused, particularly if the abuser has ongoing access to the child. The child may disclose incrementally, revealing bits and pieces over time. The child is much more likely to disclose if he or she receives a supportive response. Children have a difficult time reporting the details of the abuse and doing so in chronological order. The child is most likely to remember the first and last incidents and to remember core rather than peripheral details.

The last category, recantation, happens when a child recants a prior accusation. This happens in a significant minority of cases, typically because the child sees the negative effects of disclosure, such as someone getting upset with them, the perpetrator still having access to them, or their being placed in foster care as a result of the abuse.

10

*Defense*

A search of the car defendant drove during the chase found defendant's wallet, which contained his identification. It also held 10 one-dollar bills and five one-hundred-dollar bills, all of which appeared to be counterfeit. M.'s mother S.T. testified that M. and S.T.'s two other daughters would visit defendant and spend the night at Christina R.'s home. S.T. was contacted by Child Protective Services at some point. They spoke with her and her daughters, but there were no further dealings with the agency.

Jennifer R. knew defendant and his family since she was a child, and she previously had a romantic relationship with him. She had met Doe, who "fibbed" quite a bit and was very "ornery."

K.R. is the mother of defendant's daughter C. She has known defendant and his family for at least 20 years. She had never seen defendant act inappropriately with C. She reconnected with defendant after he left prison. Once when defendant picked her up, he had Doe and J. with him. They went to the apartment of defendant's mother, where defendant left K.R. with Doe and C. while he went out with his girlfriend. Doe was upset with this situation and called defendant many times. K.R. eventually reached him, and he told her he was on the way home but had to make a quick stop at the store. Defendant asked if Doe wanted anything from the store, and she asked for a soda. When defendant returned with the soda, Doe said she did not want it, even though it was the soda she asked for. Defendant shook his head and said the kids were stressing him out. K.R. thought Doe was being a brat and had acted unhappily all day.

Defendant's sister Christina R. testified that after a review of text messages and photographs, she did not believe that Doe was at her house when her mother-in-law Angelena T. was in Virginia during the weekend of March 25, 2017.

11

Psychologist Dr. William O'Donohue testified as an expert on child sexual abuse. Dr. O'Donohue gave a critique of CSAAS. He had published an article classifying CSAAS as a "pseudoscience" and identifying 25 problems with it. Children are highly suggestible, and repetitive questions can implant false memories in them. He opined the interview protocol used in Doe's SAFE interview was substandard, and he had developed a superior interview protocol.

DISCUSSION

I

*Amending the Information*

Defendant contends the trial court erred in allowing the information to be amended to change the date range of the offenses alleged in counts one, two, and three. He asserts the court's action violated section 1009 and his right to due process.

*A. Background*

At the preliminary hearing, the evidence established that defendant molested Doe twice at her Oak Park home when she was seven years old. On both occasions, defendant went into Doe's bedroom, woke her up by rubbing and touching her legs and thighs, held her down, and forced her to have anal intercourse. Doe was born in April 2005, and both incidents happened between 2012 and 2013. Defendant's daughter was at the house when the incidents occurred.

Accordingly, counts one through five of the original information charged defendant with committing the alleged crimes against Doe during the time she was seven years old, between April 21, 2012, and April 20, 2013. Count one charged defendant with committing a lewd and lascivious act on a child under the age of 14. (§ 288, subd. (b)(1).) Counts two and four charged defendant with engaging in separate acts of intercourse or sodomy with a child under the age of 10. (§ 288.7, subd. (a).) Counts

12

three and five charged defendant with committing lewd and lascivious acts on a child as alternatives to counts two and four, respectively. (§ 288, subd. (b)(1).)

On the first day of trial, the People moved to amend the information. The proposed amendment dismissed counts four and five, amended Doe's age in counts one, two, and three from seven years old to six to seven years old, and changed the time of those offenses from "between April 21, 2012, and April 20, 2013" to "between April 21, 2011, and April 20, 2013[.]"

Defendant objected to the proposed amendment because it did not conform to the evidence adduced at the preliminary hearing. The prosecutor responded that Doe said she was seven years old when the first molestation happened, but she also said it happened in the Oak Park home. The amendment to "six and seven years old" more accurately reflected the time when Doe lived at that home. Also, after the preliminary hearing, the prosecutor learned that April, Doe's mother, would testify that the family lived at the Oak Park house from 2011 to 2012, when Doe was six and seven years old.

The trial court asked the prosecutor if the information was being amended to conform to "the evidence that [was] introduced at prelim and is expected to come in at trial." The prosecutor affirmed it was. The prosecutor additionally argued the amendment changed nothing for the defense because defendant was denying he committed any of the charged acts of molestation. If there was an issue, the prosecutor asked to bring in April to testify to this additional information at a quick preliminary hearing. The trial court took the matter under submission.

That same day, April was called to testify at an Evidence Code section 402 hearing regarding third party culpability. Before April was sworn in, the prosecutor asked the trial court to hold a section 995a, subdivision (b)[2] hearing in conjunction with

---

[2]  Although the prosecutor stated "995(b)," she necessarily was referring to section 995a, subdivision (b), which states: "Without setting aside the information, the court may,

13

the Evidence Code section 402 hearing so that April could testify about the dates the family lived at the Oak Park home.  The trial court did not directly respond to the prosecutor's request but stated its tentative ruling was to permit the amendment.  Defense counsel asked if the court wanted him to draft a written section 995 motion.  The court said that was not necessary and the issue did not require further briefing.

During the Evidence Code section 402 hearing, April testified that she and defendant lived at the 8th Avenue, Sacramento address from 2011 to 2013 with Doe and with J. after he was born.

The following day, the trial court stated it had ruled on the motion to amend over defendant's objection and asked defense counsel if he wanted to further elaborate his objection.  Counsel declined, and defendant pleaded not guilty to the allegations in the amended information.

At the first trial, April testified that she, defendant, Doe, M., and J. after he was born lived at the Oak Park house for most of 2011 and part of 2012.  Doe's seventh birthday was in April 2012, and she was six and seven years old when they lived at the Oak Park residence.  Doe's statement in the SAFE interview that she was molested at the Oak Park residence was also admitted into evidence.

*B. Analysis*

Defendant contends amending the information's date range violated section 1009 and his due process right to be notified of the charges against him.  The new range was

upon motion of the prosecuting attorney, order further proceedings to correct errors alleged by the defendant if the court finds that such errors are minor errors of omission, ambiguity, or technical defect which can be expeditiously cured or corrected without a rehearing of a substantial portion of the evidence.  The court may remand the cause to the committing magistrate for further proceedings, or if the parties and the court agree, the court may itself sit as a magistrate and conduct further proceedings."

not supported by evidence introduced at the preliminary hearing. He claims the error is reversible per se and his convictions on counts one, two, and three must be reversed.

Section 1009 authorizes the trial court to permit an amendment of the information for any defect or insufficiency at any stage of the proceedings so long as the amendment "does not change the nature of the offense charged nor prejudice the defendant's rights." (*People v. Garringer* (1975) 48 Cal.App.3d 827, 833.) "An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) Whether the People should be permitted to amend the information is within the sound discretion of the trial court. (*People v. Winters* (1990) 221 Cal.App.3d 997, 1005.)

Amending the date range of the crimes that were established at the preliminary hearing did not violate section 1009 because it did not charge a new offense or prejudice defendant's rights. The Legislature enacted section 1009 so that the remedy of amendment is "available to save an indictment [or information] from 'any defect or insufficiency,' provided that the offense which the grand jury sought to charge is itself not changed." (*People v. Crosby* (1962) 58 Cal.2d 713, 722.) California courts have long held that where a case was prosecuted on a grand jury indictment, a mere change in the date of the alleged offense does not "change the offense charged" and is permitted by section 1009. (*Id.* at p. 721; see *People v. Wilder* (1955) 135 Cal.App.2d 742, 749 [amendment of indictment in presence of jury that offense occurred one month later to conform to proof did not change the offense charged]; *People v. Stone* (1949) 89 Cal.App.2d 853, 859 [amended indictment did not have to be resubmitted to the grand jury where amendment alleged the charged offense occurred one year earlier].)

The same reasoning must hold true where an offense is established in a preliminary hearing, and an amendment merely changes the date the offense occurred. "Under the case law interpreting section 1009, the test applied is whether or not the amendment changes the offense charged to one not shown by the evidence taken at the

15

preliminary examination." (*People v. Spencer* (1972) 22 Cal.App.3d 786, 799 [amending information charging robbery to allege defendant was armed with a deadly weapon when evidence supporting that allegation was not introduced at the preliminary hearing did not violate section 1009 because it did not change the charged offense].) Even when a preliminary hearing is waived and the prosecution is bound by the allegations of the original information, section 1009 does not prohibit nonprejudicial amendments to the information that do not charge additional offenses. (See *People v. Peyton* (2009) 176 Cal.App.4th 642, 656-659 [where amended complaint charged four counts of sexual assault (three counts or oral copulation and one count of sexual penetration), amending information to charge instead three counts of penetration and one count of oral copulation did not violate section 1009 or due process].)

Amending the date range in the information here did not change the offenses charged based on evidence established at the preliminary hearing. The change in dates caused no alteration in the nature of the sexual offenses as charged. The amendment eliminated the charges for one of the molestations which the evidence had established, but the remaining offenses were exactly the same as originally charged, and the People's theory of liability did not change because of the amendments. The location where the offense allegedly occurred remained the same—the Oak Park home. The only change was a correction in the date range to reflect accurately when the family lived in the Oak Park home. That change did not violate section 1009. (See *People v. Anthony* (1912) 20 Cal.App. 586, 590-591 [amending indictment to change date of sexual offense did not change character of the charged crime or prejudice defendant].)

Defendant nonetheless contends the amendment denied him his due process right to notice of the charges against him. "It is a fundamental principle of due process that 'one accused of a crime must be "informed of the nature and cause of the accusation." (U.S. Const., Amend. VI.)' [Citation.] This requirement is satisfied when the accused is advised of the charges against him so that he has a reasonable opportunity to prepare and

present a defense and is not taken by surprise by the evidence offered at trial. [Citations.]" (*People v. Ramirez* (2003) 109 Cal.App.4th 992, 999.)

" ' "An information which charges a criminal defendant with multiple counts of the same offense does not violate due process so long as (1) the information informs defendant of the nature of the conduct with which he is accused and (2) the evidence presented at the preliminary hearing informs him of the particulars of the offenses which the prosecution may prove at trial. [Citations.] *The information plays a limited but important role—it tells a defendant what kinds of offenses he is charged with* and states the number of offenses that can result in prosecution. However, the time, place, and circumstances of charged offenses are left to the preliminary hearing transcript. This is the touchstone of due process notice to a defendant. . . ." [¶] . . . [¶] . . . [A]n information need *not* notify a defendant of all the particulars of the crime charged. *That role is left to the preliminary hearing transcript.* Where . . . the particulars are *not* shown by the preliminary hearing transcript, the defendant is *not* on notice in such a way that he has the opportunity to prepare a meaningful defense.' (*People v. Pitts* (1990) 223 Cal.App.3d 606, 904-905 [].)" (*People v. Peyton, supra*, 176 Cal.App.4th at pp. 657-658.)

Despite the role the preliminary hearing transcript plays in notifying the defendant of the particulars of the charged offenses, "it does not constitute a denial of due process to permit amendment of an information during trial if the amendment does not change the nature of the offense charged nor prejudice the defendant's rights." (*People v. Garringer, supra*, 48 Cal.App.3d at p. 833.) "Under the generally accepted rule in criminal law a variance [in pleadings] is not regarded as material unless it is of such a substantive character as to mislead the accused in preparing his defense. . . ." (*People v. Williams* (1945) 27 Cal.2d 220, 226; see also *Pitts, supra,* 223 Cal.App.3d at pp. 905-907.)

Defendant has not established that the amendment prejudiced a substantial right. The date of his offense is not an element or a material ingredient of counts one, two, or

17

three. (§ 955; *People v. Jones* (1990) 51 Cal.3d 294, 316.) In a child molestation case, the child victim must specify the type of conduct involved and its frequency, and that the conduct occurred during the limitations period. (*Jones,* at p. 316.) "Nothing more is required to establish the substantiality of the victim's testimony in child molestation cases." (*Ibid.*) Additional details regarding the time or place of the assaults are not essential to sustain a conviction. (*Ibid.*)

The amendment to the information did not prevent defendant from defending against Doe's testimony. Both pleadings charged the same offenses in counts one, two, and three, alleging conduct with one victim and conduct occurring over the limited time Doe and her family lived at the Oak Park house. Due to Doe's age and the passage of time, she was unclear when exactly those incidents occurred. The amendments provided reasonable leeway as to the specific time the incidents occurred based on the testimony to be presented at trial, without impinging on defendant's right to fair notice and his ability to prepare a defense.

Indeed, defendant cannot claim he was without notice of the new date range. He learned that Doe and her family lived in the Oak Park house in 2011 from April's testimony at the Evidence Code section 402 hearing, and, more importantly, by the evidence adduced at the first trial.

Moreover, defendant's defense was he did not commit the offenses no matter when they may have occurred. Whether Doe was seven years old or six or seven years old was of little relevance to his defense. (See *People v. Peyton, supra*, 176 Cal.App.4th at p. 659 [amendment to information caused no prejudice where the defendant denied engaging in any illegal conduct].)

Under these circumstances, defendant suffered no prejudice and thus no denial of his due process right to notification of the charges against him.

II

*CSAAS Evidence*

Defendant claims trial counsel was ineffective in failing to object to the CSAAS testimony. According to defendant, CSAAS: (1) was irrelevant; (2) not sufficiently beyond common experience; (3) is no longer necessary to rebut public misconceptions; (4) does not meet the test of reliability for novel scientific evidence; (5) was unreliable under federal due process standards; and (6) was inadmissible under Evidence Code section 352.

To establish ineffective assistance of counsel, defendant must show: (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance. In determining prejudice, the inquiry is whether there is a reasonable probability that, but for counsel's deficiencies, defendant would have obtained a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "[T]he question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' [Citation.]" (*In re Harris* (1993) 5 Cal.4th 813, 833.) To show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland*, at p. 693.)

Numerous courts have found expert testimony concerning CSAAS properly admitted in sexual abuse cases. (See, e.g., *In re S.C.* (2006) 138 Cal.App.4th 396, 418, [collecting cases]; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.) The California Supreme Court has explained that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility

19

when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" (*McAlpin* at pp. 1300-1301, fn. omitted; see *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 [where the victim's credibility is placed at issue due to seemingly counterintuitive behavior, including a delay in reporting molestation, CSAAS evidence is pertinent and admissible to rehabilitate the victim's credibility by showing that his or her reactions are not inconsistent with abuse].)

Doe's credibility was central to the case. Her claim of being molested by defendant, whether through testimony or the SAFE exam, was the only evidence that defendant molested her and was therefore guilty of the charged offenses. Doe did not divulge the molestation until several years after it started, and even did not do so when defendant was incarcerated, rendering her temporarily beyond his reach. She did not disclose being molested until a second interview with a school counselor. CSAAS testimony was therefore relevant to explain to the jury why delayed disclosure or hesitancy about disclosing should not count against the complaining witness's credibility. We reject defendant's claim that jurors no longer harbor confusion or misconceptions about how children react to sexual abuse. And we decline to overturn California's long-standing rule allowing CSAAS evidence where, as here, the victim's credibility is placed at issue due to counterintuitive behavior. We are bound to follow the California Supreme Court's decision permitting the admission of CSAAS evidence for the limited purpose it was admitted here. (*People v. McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) For that reason, defendant's reliance on out-of-state cases that find CSAAS evidence inadmissible is misplaced.

Trial counsel was not deficient for failing to object to the CSAAS testimony because it fails to satisfy the legal requirements for the admissibility of new scientific methodologies under *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Kelly/Frye* rule). The *Kelly/Frye* rule does not apply where, as here, the CSAAS testimony is admitted " 'for the limited purpose of disabusing [the] jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.]' " (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.) When introduced for that purpose, and when, as here, the evidence is limited to the expert's own clinical experience and familiarity with relevant professional literature, the CSAAS evidence does not implicate *Kelly/Frye* principles. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449.)

Finally, we reject defendant's contention that trial counsel was deficient for failing to object to the CSAAS evidence on the ground it was inadmissible under Evidence Code section 352. As previously stated, the CSAAS was relevant to rebut misconceptions about child sexual abuse that might diminish Doe's credibility and the probative value of her testimony. We also reject defendant's contention that the CSAAS testimony was prejudicial because it bolstered Doe's credibility. The undue prejudice that section 352 is designed to avoid is not the prejudice to a defense that naturally flows from relevant evidence. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 150.) Rather, undue prejudice refers to evidence that " ' " 'uniquely tends to evoke an emotional bias against [a party] *and which has very little effect on the issues*.' " [Citations.]' " (*Ibid*.) The CSAAS testimony was not prejudicial under this standard, and the evidence was admissible under Evidence Code section 352.

Since any objection to the CSAAS evidence would have been denied, counsel's failure to raise them was not ineffective assistance. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

21

*CALCRIM No. 1193*

Without objection, the trial court instructed the jury with CALCRIM No. 1193 as follows:

"You have heard testimony from Dr. Anna Washington and Dr. William O'Donohue regarding child sexual abuse accommodation syndrome.

"Dr. Washington's and Dr. O'Donohue's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not [Doe's] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Defendant contends the instruction is defective by allowing a jury to use CSAAS evidence to evaluate the credibility of the complaining witness, Doe. According to defendant, "where the only evidence of the misconduct is the complaining witness's own testimony, the believability of the complaining witness and the truth of the claim are effectively one and the same." From this, he concludes the instruction violates the prohibition against using expert testimony "to determine whether the victim's molestation claim is true." (*People v. Housley* (1992) 6 Cal.App.4th 947, 959.)

"Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

In *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), the court rejected the argument that CALCRIM No. 1193 is inconsistent and improperly allows CSAAS testimony to be used as proof that the victim was sexually abused. (*Gonzales,* at pp. 503-

504.) The defendant argued it is impossible to use the CSAAS testimony to evaluate the believability of the victim's testimony without also using it as proof that the defendant committed the charged crimes. (*Id*. at p. 503.)

The *Gonzales* court disagreed, noting that the instruction was given in the context of the expert's testimony that CSAAS is a tool to understand a child's reactions when he or she has been abused and is not to be used to determine whether abuse has occurred. (*Gonzales, supra*, 16 Cal.App.5th at pp. 503-504.) The court held that a "reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*Gonzales,* at p. 504.)

We agree with *Gonzales.* The instruction correctly informs jurors that they may use CSAAS evidence for the limited purpose of deciding whether the victim's conduct was consistent with having been abused, but not to determine whether the alleged abuse occurred. Such an interpretation is bolstered by testimony from the prosecution's expert that CSAAS is not a tool to determine whether abuse occurred. As *Gonzales* explained, "under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales, supra*, 16 Cal.App.5th at p. 504.) Under the circumstances, we find no error.

IV

*Victim Photographs*

The trial court admitted photographs of Doe when she was younger, from the years 2012, 2013, 2016, and 2017. Defense counsel stated he had no objection to their

23

admission. Defendant contends counsel rendered ineffective assistance by not objecting to their admission because the photographs were irrelevant and were more prejudicial than probative.

The California Supreme Court has repeatedly warned in murder cases that trial courts should be cautious in the guilt phase about admitting photographs of the victim while alive due to the risk that the photographs will merely generate sympathy for the victim. (*People v. Harris* (2005) 37 Cal.4th 310, 331.) "But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.) The decision to admit victim photographs falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Harris,* at pp. 331-332.) Defendant argues under this principle that the photographs were irrelevant and prejudicial, and counsel should have objected to their admission.

Assuming for purposes of argument that this principle applies here, we nonetheless conclude defendant has not established that his trial counsel rendered ineffective assistance by not objecting to the photographs. Nothing in the record indicates why counsel did not object to the photographs, nor can we say that counsel simply could not have had a satisfactory explanation for not objecting. Under these circumstances, we must reject a claim of ineffective assistance on direct appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

Moreover, defendant has not established that admitting the photographs was prejudicial, the second prong of the test for ineffective assistance. In determining prejudice, we ask whether there is a reasonable probability that, but for counsel's deficiencies, defendant would have obtained a more favorable outcome. (*Strickland v. Washington, supra*, 466 U.S. at p. 694.)

24

That reasonable probability does not exist here.  Even if the photographs had not been admitted, the jury likely would have visualized images of Doe at the time of the molestations similar to the photos shown at trial.  (See *People v. Orey* (2021) 63 Cal.App.5th 529, 549-550 [admission of victims' photographs at the ages of molestations was harmless error].)  And the prosecutor did not mention the photographs in her closing argument.  Under these circumstances, we cannot conclude defendant would have received a more favorable result had the photographs not been admitted.

V

*Informing the Jury About Juror Being Excused*

Defendant contends the trial court prejudicially erred by informing the jury during deliberations that a juror had been removed because she had not been feeling well.  This happened during the outset of California's response to the COVID-19 pandemic.  Defendant asserts that giving the jury this information at that time gave the jury an incentive to reach a verdict quickly rather than accurately, thereby depriving him of his right to a jury trial.  He further contends counsel's failure to object to the court's statement rendered ineffective assistance.

A.  *Background*

"On March 4, 2020, due to the outbreak of the COVID-19 virus, Governor Gavin Newsom declared a state of emergency."  (*In re M.P.* (2020) 52 Cal.App.5th 1013, 1016, fn. omitted.)  Jury deliberations began on March 10, 2020, at 11:58 a.m.  As the jurors left the courtroom, Juror No. 4 told the bailiff she was not feeling well and might be unavailable for deliberations.  The trial court told defense counsel and the prosecutor about Juror No. 4's statement and told them to appear at 1:30 p.m.  When proceedings resumed, the trial court asked the parties how they wished to address the matter; defense counsel asked for Juror No. 4 to be brought in before she is excused.  Questioned by the

25

trial court, Juror No. 4 said she was feeling feverish and achy. Neither party had any questions for Juror No. 4, who was excused from the courtroom.

After Juror No. 4 left, the trial court said:

"Just so the record's clear, at some point, if and when this ever is in front of anyone, there is something called the Corona Virus going around, and people are—I don't know whether they're rightly or wrongly—I would use the word panicked, because that really is what appears to be going on.

"I don't think anybody has any idea whether it is something that is a justified type of a panic that has affected virtually every aspect of life as we have moved forward.

"The very generic symptoms she's describing would fall within a number of different ailments, including that, but I don't know what counsel want to do."

Defense counsel noted that Juror No. 4's attention had been waning recently and wondered if her health had been affecting her for the last few days.

The trial court asked defense counsel if he was comfortable with dismissing the juror and replacing her with an alternate. After conferring with defendant, counsel told the court he and defendant were comfortable with dismissing Juror No. 4, who was then excused by the trial court and replaced with an alternate.

The jurors were called into the courtroom, after which, the court told them:

"All right. We are back on the record in the People versus Reese.

"And just so you know, I know you didn't even get to begin deliberating or anything because we kind of broke before that even got a chance to happen.

"What happened was Juror No. 4 just wasn't feeling well, and we have—and after talking to her, we've excused her from the matter. That's why we've got alternates. Just kind of an abundance of caution sort of a thing." Defendant did not object to the statement.

After the alternate was sworn in and the jury commenced deliberations, the trial court asked both parties if there was anything either wanted to address before recess. Defense counsel and the prosecutor both declined.

The jurors recessed at 4:27 p.m., returning the following day, March 11, 2020. At 9:11 a.m., they informed the trial court they had reached their verdicts.

Sentencing was held on September 25, 2020. Defense counsel told the trial court at the hearing that defendant:

"[W]rote the Court, as well and spoke about a concern about the jury admonition when one of the jurors was excused. This was a novel issue. It was the beginning of the Corona virus pandemic, and one of the jurors was ill or becoming sick and was excused for that purpose.

"In part I think because that juror was not feeling well and other jurors might have gotten nervous, and Mr. Reese wanted to make sure he didn't waive any issues of appeal on that matter for that excusal and whether or not that could have acquainted [*sic*] to a mistrial in an inappropriate admonition at the time."

The trial court noted the date of the verdict and indicated it did not believe COVID-19 was an issue at the time. Defense counsel said the defense wanted to make sure "that is part of the record" and that "we didn't waive anything here at this stage . . . [¶] . . . so the appellate attorney will take notice of it and look into the matter."

### B. Analysis

Defendant did not object to the trial court's statement to the jury when it was made, and he did not subsequently move for a new trial based on any alleged error regarding it. Since the court's statement was not an instruction on the relevant law to apply to the case, defendant's claim is classified as a species of alleged judicial misconduct. Defendant's failure to object to the court's statement forfeits the contention on appeal. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [failure to object to alleged

27

judicial misconduct forfeits arguments on appeal].)  We address only the claim of ineffective assistance.

"A trial judge should refrain from placing specific time pressure on a deliberating jury and should never imply that the case warrants only desultory deliberation.  Such comments risk persuading legitimate dissidents, whatever their views, that the court considers their position unreasonable." (*People v. Keenan* (1988) 46 Cal.3d 478, 534.)

The trial court's statement to the jury did no more than tell the jurors the truth, a fellow juror had been dismissed because she was not feeling well.  It did not tell the jury how to deliberate or how quickly to do so and did not indicate a preference for either the prosecution or the defense.  Jurors would naturally wonder why one of their fellow jurors was excused.  It is not misconduct for the trial court to tell them the truth.

The case defendant primarily relies upon is inapposite.  *People v. Bradford* (2007) 154 Cal.App.4th 1390 involved a trial court's ex parte communications with a deliberating jury, in which, among other comments, the trial court asked the jurors if they intended to continue deliberating.  (*Id.* at pp. 1413-1414.)  Noting that uniform authority establishes the impropriety of a trial judge engaging in ex parte communications with a deliberating jury (*id.* at p. 1415), the Court of Appeal concluded that interrupting a deliberating jury to ask if they intended to keep deliberating could easily lead the jury to interpret the trial court's "abrupt invasion of the jury's private deliberation" to imply that the jurors should rush to make a decision.  (*Id*. at p. 1414, fn. 12.)  Here, the trial court made no improper ex parte communication with the jury, and its comments did not imply that the jurors should rush to judgment.

Since the trial court's statements were proper, any objection to them would be futile.  Counsel does not render ineffective assistance by not making objections which counsel reasonably determines would be futile.  (*People v. Price* (1991) 1 Cal.4th 324,

387.)  Counsel's failure to object was not substandard representation, and therefore the claim of ineffective assistance fails.[3]

## VI

### *Cumulative Error*

Defendant next claims that the preceding errors justify reversal under the doctrine of cumulative error.  "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.  [Citations.]"  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  At most there is only one possible error, the admission of the photographs of Doe when she was younger, and that error is not prejudicial under any standard.  Since there is no additional error to accumulate, the doctrine is inapplicable.

## VII

### *Dueñas*

The trial court imposed a $300 restitution fine (§ 1202.4), a $200 court security fee (§ 1465.8) and a $150 criminal conviction assessment (Gov. Code, § 70373).  Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant contends these fines and fees should be stricken because there was no proof of his ability to pay them.  Alternatively, the matter should be remanded for a hearing on his ability to pay.

---

[3] We are also not persuaded by defendant's citation to the different time spent deliberating by the first and second juries.  The first jury asked for a readback of the evidence and spent the better part of three days deliberating before informing the trial court that it could not reach a verdict.  It is speculation to assume the second jury reached a guilty verdict in a little more than a day because of the trial court's comments regarding Juror No. 4's excuse from service.  The first jury hung 10 to two in favor of guilt; the greater time it spent deliberating could be explained by the 10 jurors trying to convince the two holdouts to change their vote.

Defendant was sentenced in September 2020, over a year after *Dueñas* was decided. He raised no *Dueñas* objection to the imposition of the restitution fine, court security fee, or conviction assessment, thereby forfeiting the contention on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 351-354 [to preserve a sentencing issue for review, it must be raised in the trial court]; see *People v. Aguilar* (2015) 60 Cal.4th 862, 866-867 [the defendant's failure to object at sentencing to certain fees on the basis of his inability to pay forfeited the challenge on appeal].)

Defendant claims counsel's failure to raise the *Dueñas* issue at sentencing is ineffective assistance.

The Supreme Court is now poised to resolve the issues raised in *Dueñas*, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844. That opinion agreed with *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities fees and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4. (*Kopp*, at pp. 95-96, review granted.)

We need not decide this issue. As explained below, we are remanding this matter for resentencing, where the trial court may address this issue in the first instance.

VIII

*Assembly Bill 518 and Senate Bill 567*

While this appeal was pending, two items of legislation that could apply to defendant's sentence went into effect. Assembly Bill 518 increases the trial court's discretion to stay a sentence under section 654. Senate Bill 567 limits the imposition of upper term sentences by making the middle term the presumptively correct term and requiring a jury trial and proof beyond a reasonable doubt for aggravating factors other than a defendant's prior convictions. Defendant argues in two supplemental briefs that he

30

is entitled to the benefit of both bills, and that the case should be remanded for resentencing.

### A. Background

The trial court sentenced defendant to an aggregate prison term of 40 years plus 165 years to life, which consisted of:

75 years to life on count 2 (sodomy with a child; § 288.7, subd. (a)):  25 years to life tripled to 75 years to life for two prior strikes (§ 667, subd. (e)(2)(A)(i));

30 years to life on each of counts 1, 4, and 5 (lewd and lascivious act on a child; § 288, subd. (b)(1)):  upper term of 10 years tripled to 30 years to life for two prior strikes (§ 667, subd. (e)(2)(A)(i)); and

40 years for two serious priors (§ 667, subd. (a)):  five years for each serious prior per sentenced count.

The court stayed under section 654 a sentence of 30 years to life on count 3 (§ 288, subd. (b)(1):  upper term of 10 years tripled to 30 years to life for two prior strikes).  The count was pleaded as an alternative to the sodomy count in count 2.

The court made two findings for imposing the upper term on counts 1, 3, 4, and 5, both of them aggravating findings:  Defendant took advantage of a position of trust or confidence, and he engaged in violent conduct, making him a serious danger to society. (See Cal. Rules of Court, rule 4.421(a)(11), (b)(1).)

### B. Assembly Bill 518

During the pendency of this appeal, the Governor signed Assembly Bill 518, which took effect on January 1, 2022.  (Stats. 2021-2022, ch. 441, § 1.)  Prior to Assembly Bill 518, section 654 required the trial court, when sentencing for an act that was punishable under different provisions of law, to sentence the defendant under the provision that provided the longest potential term of imprisonment.  (Stats. 1997, ch. 410, § 1.)  Assembly Bill 518 grants the trial court discretion in that situation to sentence a

defendant under either of the different sentencing provisions. (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) "Because Assembly Bill 518 was enacted while defendant's appeal was not yet final and it provides the trial court new discretion to impose a lower sentence, defendant is entitled to its ameliorative benefit." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Under the amended section 654, the trial court now has the discretion to stay the greater term in count two and impose the 30 years to life it stayed for count three instead. Defendant argues that the matter should be remanded for the trial court to exercise its discretion under the amended section 654. The Attorney General counters that remand is inappropriate because the record indicates the trial court would not exercise its discretion to stay the greater term. We agree with the Attorney General.

Remand is required "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; *People v. Franks* (2019) 35 Cal.App.5th 883, 892-893.) Here, we need not reach the issue because we are remanding for resentencing under Senate Bill 567.

*C. Senate Bill 567*

Senate Bill 567 became effective January 1, 2022. (Stats. (2021-2022), ch. 731; Cal. Const., art. IV, § 8, subd. (c).) The act generally prohibits a trial court from imposing an upper term sentence except where there are circumstances in aggravation of the crime that justify imposing the upper term, and the facts underlying those circumstances (1) have been stipulated to by the defendant, or (2) have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. (§ 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.) An exception to this rule authorizes the court to consider defendant's prior convictions in determining sentencing

based on certified records of conviction without submitting the prior convictions to the jury. (§ 1170, subd. (b)(3), added by Stats. 2021, ch. 731, § 1.3.) The court must set forth on the record the facts and reasons for choosing the sentence imposed. (§ 1170, subd. (b)(5).)

The parties and we agree that Senate Bill 567 is retroactive and applies to this nonfinal case. The act provides an opportunity for defendant to receive a lesser penalty, and there is no indication the Legislature intended the act to apply prospectively only. (*In re Estrada* (1965) 63 Cal.2d 740, 745.)

Defendant's sentence did not comply with Senate Bill 567. Facts underlying the court's two findings for imposing the upper term on counts 1, 3, 4, and 5—defendant took advantage of a position of trust or confidence, and he engaged in violent conduct making him a serious danger to society—were not found by a jury or stipulated by defendant.

Nonetheless, the Attorney General contends we are not required to remand this matter for resentencing because the trial court impliedly relied upon defendant's criminal history and unsatisfactory performance on parole as grounds for imposing the upper terms, factors that under Senate Bill 567 do not need to be determined by a jury. The Attorney General also contends that any error in not satisfying Senate Bill 567 was harmless because the jury, beyond a reasonable doubt, would have found true the aggravating circumstances on which the court relied.

We disagree with the Attorney General that we can affirm the upper term sentences based on the trial court's implicit reliance on defendant's serious priors. The trial court cannot merely imply facts to support aggravating factors. Section 1170 requires the court to set forth expressly in the record the facts and reasons for choosing the sentence imposed. (§ 1170, subd. (b)(5).) The trial court set forth only two factors for imposing the upper terms, neither of which included defendant's prior convictions or his performance on parole. Had the trial court relied upon and found either of those

33

factors true, it was required to have expressed that finding in the record. (See *People v. Boyce* (2014) 59 Cal.4th 672, 727-728 [aggravating factors listed in probation report stemming from defendant's criminal history did not support upper term where trial court did not expressly find any of those factors true].) Because the trial court did not expressly rely on defendant's recidivism, we cannot affirm the upper term sentences based on that factor. We do not consider that factor any further in our analysis.

We turn to harmless error. Senate Bill 567 is now the statutory means by which California provides criminal defendants their Sixth Amendment right to a jury trial on upper-term sentencing factors. Under that right, at least one sentencing factor that results in a sentence above the middle term must be found by a jury or stipulated by the defendant. (*Cunningham v. California* (2007) 549 U.S. 270, 288-289; *People v. Black* (2007) 41 Cal.4th 799, 812-813.) If one such factor is found, defendant as a matter of constitutional law is eligible for the upper term, and, according to the pre-Senate Bill 567 opinion in *Black*, the trial court is free to rely on any number of aggravating circumstances whether or not found by a jury in exercising its discretion to select the appropriate term. (*Black,* at pp. 813, 815-816.)

By the same reasoning, a violation of the Sixth Amendment right is harmless under *Chapman v. California* (1967) 386 U.S. 18 "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury . . . ." (*People v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*).)

Senate Bill 567 imposes an additional layer of protection for defendants, requiring all facts supporting aggravating circumstances to be found true beyond a reasonable doubt by a judge or jury, but it does so as a matter of state law. To find harmless error under state law, we apply the standard set forth in *People v. Watson, supra*, 46 Cal.2d at page 836. Under that standard, "we must find that the trial [court] *would* have imposed

34

the upper term sentence even absent the error. In particular, we must consider whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error." (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112 (*Zabelle*).)

The Attorney General contends that the trial court's imposition of the upper term without complying with Senate Bill 567 was harmless because, under the *Chapman/Sandoval* standard, it is beyond a reasonable doubt that the jury would have found true beyond a reasonable doubt one if not both of the aggravating facts relied upon by the trial court.

No doubt, if we applied the *Chapman/Sandoval* standard to both of the trial court's aggravating facts and determined the jury would have found them to be true beyond a reasonable doubt, defendant would have suffered no prejudice. (*Zabelle, supra*, 80 Cal.App.5th at p. 1113.) In this appeal, however, defendant has not alleged a violation of his Sixth Amendment right. He contends only that his sentence violated Senate Bill 567, which it did. Because the error is purely one of state law, we apply the *Watson* harmless error test. (*Zabelle*, at pp. 1112-1113.)

To apply this test, we must ask two questions. For each aggravating fact, we must consider "whether it is reasonably probable that the jury would have found the fact not true. We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Zabelle, supra*, 80 Cal.App.5th at p. 1112.) A reasonable probability does not mean more likely than not. It means a "reasonable chance and not merely a theoretical or abstract possibility." (*People v. Woods* (2015) 241 Cal.App.4th 461, 474 [applying *Watson* standard to omission of instruction on lesser included offense].)

Answering the first question, we conclude it is not reasonably probable the jury would have found not true a finding that defendant took advantage of a position of trust

35

or confidence. Doe viewed defendant as a father figure and called him "dad." Even April, Doe's mother, thought of defendant as Doe's father.

April entrusted Doe's care to defendant. When Doe lived with April and defendant in the Oak Park house, defendant would watch her and the couple's infant son and put them to bed when April worked evenings and nights. When defendant picked April up from work, he would bring the children with him because they were too young to be home alone.

Doe stated that some of the molestations that occurred at the Oak Park house happened when April was at work. In her SAFE interview, Doe said that on one occasion at the Oak Park house, defendant woke her up and told her they were going to pick up her mother from work soon. After Doe went back to sleep, defendant molested her until it was time to pick up April at work. At trial, Doe testified that on one occasion at the Oak Park house, when defendant woke her up, she thought he was waking her up to pick up April from work. But defendant molested her instead.

After defendant's incarceration ended in 2016, he and April resumed their relationship. He would stay at April's residence a few times a week. April worked in the Bay Area and worked long and odd hours, and she again entrusted Doe's care to defendant. Defendant would help with the children during those times, taking them to and from school and putting them to bed. The children would also stay the night, usually on weekends, with defendant at his residence. The details of defendant's relationship of trust with Doe were undisputed. From this evidence, we conclude it is not reasonably probable the jury would have found not true that defendant took advantage of a position of trust or confidence.

Turning to the trial court's second aggravating factor, we are unable to determine whether it is reasonably probable the jury would have found not true that defendant engaged in violent conduct making him a serious danger to society. As part of finding defendant guilty of the molestations, the jury determined that defendant committed the

36

offenses with force or fear. The facts relied upon by the jury to make those findings could not be used by the trial court to impose the upper term, and we cannot presume to know what additional facts the prosecution would have successfully proved to establish the factor. (Cal. Rules of Court, rule 4.420(h).) Also, whether defendant poses a "serious" danger to society involves a vague and subjective determination which makes it difficult for us to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court. (See *Sandoval, supra*, 41 Cal.4th at p. 840.)

We thus must ask the second question in our harmless error inquiry: excluding the factor of defendant being a serious danger to society, is there a reasonable probability the trial court would have imposed a more lenient sentence? (*Zabelle, supra*, 80 Cal.App.5th at p. 1112.) Under some circumstances, a reasonable probability of a more favorable result exists where the improper factor was determinative for the sentencing court or where the reviewing court cannot determine whether the improper factor was determinative. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

On this record, we cannot conclusively determine whether the improper factor of defendant being a serious danger to society was determinative, but we can determine the trial court gave that factor great weight in its sentencing decisions. Denying defendant's motion under *People v. Romero* (1996) 13 Cal.4th 497 to dismiss one or both of defendant's prior strikes, the court stated that defendant's "type of criminality is exactly the type of criminality that endangers people in the community, particularly the conduct in this case with a very young victim and sexual acts passing over the course of actually years, because he reengaged in the conduct subsequent to being released from prison." Denying defendant's motion to dismiss the serious priors, the court stated, "Again, this is a case where the public deserves to be protected from this Defendant and his habitual criminality, and particularly the type of conduct that is reflected by the trial that this Court heard." On these motions, although the trial court considered the danger defendant

37

presented to society, it did not reference defendant taking advantage of a position of trust or confidence.  It mentioned that factor only when it stated it as its aggravating finding.

Under these circumstances, where it appears the improper factor, if not determinative, was at least highly influential in the court's sentencing decisions and the supported factor was not, we cannot conclude the trial court would have found the sole circumstance of defendant's taking advantage of a position of trust sufficient to warrant imposing the upper term sentence.  Thus, we conclude there is a reasonable probability the trial court would have imposed a more lenient sentence under Senate Bill 567.  As a result, remand for resentencing under Senate Bill 567 is required.

## DISPOSITION

The matter is remanded for resentencing pursuant to Senate Bill 567.  In all other respects, the judgment is affirmed.

_____

HULL, J.


We concur:



_____

ROBIE, Acting P. J.



_____

RENNER, J.

38